DOUGLAS T. BATES *et al. v.* GEORGIA FERTILIZER
COMPANY.

*(Nashville.* December Term, 1920.)

1. **MINES AND MINERALS.** Lessee held not entitled under forfeiture
   clause to avoid lease for own default.

   A clause in a mineral lease, providing that, if lessee failed to mine
   a minium quantity of the mineral so long as it was found in pay-
   ing quantities on the premises, or to pay a minimum royalty, the
   lease should be void without demand or entry by lessor, will be
   construed merely to give lessor the option to forfeit the lease in
   case of breach, and not to terminate the lease regardless of such
   option, since the latter construction would permit lessee to avoid
   his obligations for his own default, and will be adopted only
   where such intention is clearly expressed by the parties. *(Post,
   pp.* 40-45.)

   Cases cited and approved: Evans v. Consumers' Gas Trust Co..
   29 N. E., 398; Woodland Oil Co. v. Crawford, 55 Ohio St., 161;
   Hanley Falls Creamery Co. v. Mi'ton Dairy Co., 126 Minn., 226.

   Cases cited and distinguished: Wills v. Gas Co., 130 Pa., 222; Ray
   v. Gas Co., 138 Pa., 576.

2. **MINES AND MINERALS.** Lease of phosphate land held to require
   lessee to mine in good faith until entire deposit was removed.

   A lease of phosphate lands for five years and as long thereafter as
   phosphate rock might be found in paying quantities, requiring
   lessees to mine a minimum quantity per month or pay lessors a
   royalty on such amount per month, obligated lessees to mine
   minerals in good faith until the entire deposit was removed, pro-
   vided they were found in paying quantities. *(Post, pp.* 45, 46.)

3. **MINES AND MINERALS.** Whether construed as a lease or license,
   conveyance of exclusive right to mine passes corporeal interest in
   land.

Bates v. Georgia Fertilizer Co.

Whether construed to be a lease or merely a license, a contract, which conveyed to lessee or licensee the exclusive right to mine minerals in land, passed a corporeal interest in the land which could be assigned, divided, or dealt with as any other interest therein. ( *Post*, *p.* 46.)

Case cited and approved: Stanton v. Herbert & Sons, 141 Tenn., 447.

4.  **MINES AND MINERALS.** Original lessees held entitled to profit royalties from assignee.

Where the original lessees of mineral land assigned the lease to a corporation, which agreed to pay the royalty to the landowners reserved by the original lease and an additional royalty to the original lessee, there is sufficient privity of contract between the original lessees and their assignee to entitle them to recover their profit royalty, though the assignee had made some arrangement with the original lessor under which it had ceased to remove minerals. (*Post*, *p.* 46.)

5.  **MINES AND MINERALS.** Lessor not necessary party to bill by original lessee to recover profit royalties from assignee.

In a bill by the original lessee of mineral land against his assignee to recover the amount of royalties the assignee agreed to pay him in addition to the royalties to lessor and also the amount of royalties due lessor which the original lessee had paid to prevent forfeiture of the lease, in which bill no relief was asked against lessor, lessor was not a necessary party, though the bill alleged that lessor and the assignee had made some arrangement between themseves whereby the lessor refused to receive the royalties from the assignee so as to forfeit the lease and deprive the assignee of his royalties. (*Post*, *pp.* 47, 48.)

---

FROM DAVIDSON

---

Appeal from the Chancery Court of Davidson County.— HON. JAS. B. NEWMAN, Chancellor.

144 Tenn.—3

CHAS. C. TRABUE and SAM. HOLDING, for appellants.

PITTS & McCONNICO, for appellee.

MR. JUSTICE HALL delivered the opinion of the Court.

The appeal in this cause involves the correctness of the chancellor's action in sustaining the demurrer of the defendant to complainant's bill.

The bill was filed by the complainants, Douglas T. Bates, James A. Smiser, E. H. Ayres, and E. H. Ayres, Jr., to recover of the defendant, Georgia Fertilizer Company, the profit royalties alleged to be due under a certain mining lease contract by which the defendant obligated itself to mine a certain minimum quantity of phosphate and phosphate-bearing rock from a certain tract of land in Hickman county, Tenn., known as the "Well Field," which land is particularly described in the bill and in the lease filed as Exhibit A thereto, or pay a certain minimum royalty per month; or in the alternative to recover all damages for the breach of said lease contract.

The lease bears date of October 2, 1907, and was executed by George Stanfill and wife, Sallie Stanfill, and Amelia Gray Broome to James Craik and D. O. Priest, their heirs and assigns, and was for a period of five years and as long thereafter as phosphate and phosphate-bearing rock might be found on said land in paying quantities. By the terms of said lease Craik and Priest were obligated to pay one dollar per ton royalty on each car shipped, but in any event a minimum royalty of $100 per month was to be paid during the life of the lease.

On October 18, 1907, Craik and Priest assigned all their rights and privileges under said lease to the defendant, and the latter agreed to pay the said royalty of one dollar per ton to Stanfill and Broome, and, in addition, fifty cents per ton royalty to Craik and Priest, at the same time and on exactly the same terms as the said one dollar royalty was to be paid.

Thereafter Priest assigned to complainants Bates and the Ayres his one-half interest in the superroyalty of fifty cents, and Craik likewise assigned to complainant Smiser a one-fourth interest in his one-half interest of said superroyalty; the other one-fourth interest of Craik in said superroyalty was assigned to defendant, which had the effect of canceling twelve and one-half cents of said superroyalty. By these assignments complainants acquired thirty-seven and one-half cents of said superroyalty, and the remaining twelve and one-half cents was canceled, as before stated, by the assignment of Craik to defendant.

According to the bill defendant began mining operations under said lease, and after mining about 1,000 tons ceased active mining operations, but continued to pay to the owners of the land the minimum royalty of $100, and also paid to complainants the minimum superroyalty of $37.50 per month up to June 1, 1917, when, without assigning any reason therefor, but refusing to give any reason, ceased to pay the royalties, and did not thereafter assume mining operations. When complainants learned that defendant had failed and refused to pay the original minimum royalty of $100 owing by it on July 1, 1917, the bill alleges that complainants advanced and paid said original

royalty, and likewise, paid the original royalties of $100 becoming due and payable on August 1, 1917, and on September 1, 1917; that these payments were made by complainants in order to prevent a forfeiture of the lease, and in the hope that the defendant would, on reconsideration, continue to comply with said contract as it had in the past, and would reimburse complainants for the advances so made; but no part of the superroyalties accruing to complainants from and after July 1, 1917, had been paid to them, nor had defendant repaid to them the $300 advanced by them to pay the original royalties; that complainants had received information that indicated that defendant has some sort of an understanding with the Blue Grass Phosphate Company (who has succeeded Stanfill and Broome as owner of said premises), by which said owner was to co-operate with defendant for the purpose of effecting a cancellation of said lease, and that it was in pursuance of this understanding that defendant had quit paying royalties so as to furnish ground for such cancellation, because, after complainants had advanced the said sum of $100 per month for defendant for three months, the Blue Grass Phosphate Company notified complainants that it would not accept from them any further payment of royalties.

The bill alleges that there are, in paying quantities in and upon said tract of land embraced in said lease 200,000 tons of phosphate and phosphate-bearing rock, and that defendant, under the terms of said lease, is obligated to mine all of said rock and pay to complainants the super-

royalties due them under said lease and their assignments from Craik and Priest.

The lease, among other provisions, contains the following forfeiture clause:

"Said Craik and Priest, their heirs and assigns, are to mine and ship said phosphate and phosphate-bearing rock as they come to the same, taking it clear as they go, lump and disintegrate alike, are to pay us for same at the rate of one dollar per ton royalty, railroad weights on each car immediately upon receipt of bill of lading; and are to mine and ship from said premises as much as 100 tons of phosphate and phosphate-bearing rock each and every month during the life of this contract, and, should they neglect or fail to do so, from any cause whatever during any month, they may pay royalty on that amount as though it had been mined, the excess paid over and above the amount due on rock actually mined to be deducted from the amount subsequently mined in excess of the 100 tons per month, and, in case of failure to mine or pay on 100 tons at the end of any month as herein provided, they are to forfeit all rights under this contract, and the same is to immediately become null, void and inoperative, and no re-entry, demand for compliance or money, or any other act or omission on the part of any of the parties to this contract shall be necessary to complete such forfeiture, save simply a failure to mine and ship 100 tons of phosphate of phosphate-bearing rock, or pay on that amount as herein provided."

The bill alleges that said forfeiture clause is entirely for the benefit of the lessors; that it is not self-executing

or automatic, and it is specifically alleged that, as a matter of fact and law, said lease has never been forfeited by the lessors, or their assignee, and that therefore defendant is indebted to them for their superroyalties accruing since June 1, 1917, or if the lessors, or their assignee, has, in fact, declared a forfeiture on account of defendant's default, then complainants are entitled to have and recover from defendant all damages accruing to them by reason of its default and breach of said lease.

The demurrer filed by defendant contains five grounds; the second ground being divided into seven subsections or heads.

The first ground of the demurrer is that the bill shows a want of necessary parties, in that it seeks, in one of its aspects, to have the lease in question declared to be still in force, and that its attempted forfeiture or cancellation by the refusal of the lessor to accept further voluntary payment of royalties from complainants was collusive and ineffectual, but the said lessor, the Blue Grass Phosphate Company (successor in title to the original lessors to the leased premises), is not made a party.

The second ground of the demurrer is that the bill and exhibits thereto show that complainants have no cause of action against defendant for various reasons. These reasons are then set out under seven subsections or heads of said second ground. The substance of all of them, however, being that the original lease imposed no obligation on the lessees to mine said phosphate and phosphate-bearing rock from said land, but that it only granted the right and privilege to mine; that the forfeiture clause was auto-

matic and for the benefit of the lessee, and that defendant had the exclusive and sole right of determining whether said lease should be kept alive; that complainants had no right to pay the original royalties for the purpose of keeping said lease alive, and that such payments by them were voluntary and officious; that, defendant having exercised its right not to mine under said lease, it, therefore, by its very terms, became terminated and forfeited after June, 1917.

The third ground of the demurrer is to the effect that the obligation to mine or pay royalties was a condition upon which the continuance of the lease depended, and was not a covenant to mine or pay.

The ground of the demurrer numbered 3a is that the contract created a mere license to mine, and not a leasehold estate, which license was automatically terminated by the conditions of the lease.

By the fourth ground of the demurrer it is asserted that the bill and exhibits disclose no equity or cause of action against defendant.

The fifth ground of the demurrer goes to the eleventh paragraph of the bill, which alleges that complainants received information that clearly indicated that defendant had an understanding with the Blue Grass Phosphate Company (who had succeeded Stanfill and Broome as owner of said premises), by which said owner was to co-operate with the defendant for the purpose of effecting a cancellation of said lease, and that the refusal of the said Blue Grass Phosphate Company to receive further officious pay-

ments from complainants was in pursuance of such under-standing.

The defendant demurs to this paragraph of the bill: (1) Because the averments of said paragraph are too vague, general, and indefinite to give complainants any right of action, or to require any answer; and (2) because defendant, having the legal right to discontinue and end said lease by its terms at any time, it is wholly immaterial and no concern of the complainants whether said Blue Grass Phosphate Company co-operated with it in effecting such termination or not; and (3) because the Blue Grass Phosphate Company is not a party to the suit, and such an issue cannot be made and determined in its absence.

The chancellor was of the opinion that the forfeiture clause was inserted in the lease for the benefit of both the lessor and lessee, and that the defendant could terminate the lease at any time by its failure to mine or pay the royalties therein specified, and relieve itself of further lia-bility.

We are of the opinion that the chancellor committed error in sustaining the demurrer to the bill.

In Cyc. vol. 27, p. 734, the rule with respect of forfeiture clauses is stated as follows:

"Forfeiture clauses are for the benefit of the lessor, who may assert the forfeiture or forbear to do so. . . . And this is true, although the lease contains a provision that it shall be void or cease and determine on failure by the lessee to comply with the conditions specified."

In R. C. L. vol. 16, section 618, it is said:

"In the early cases a provision that a lease should become 'void' on the tenant's default in the performance of stipulations was construed as a limitation, *ipso facto* terminating the estate on the happening of the contingency; it was soon discovered, however, that in practical application this enabled the tenant to nullify the lease merely by taking advantage of his own default, and the great weight of authority now is that *whatever the form of language used* (the italics are ours), whether adapted to the creation of a special limitation or a condition subsequent, the provision will be construed as the latter, unless a contrary intent is clearly expressed."

In *Wills* v. *Gas Co.*, 130 Pa., 222, 18 Atl. 721, 5 L. R. A., 603, an oil and gas lease was involved. The forfeiture clause was as follows:

"And it is further understood and agreed that upon the failure by the party of the second part, its successors and assigns, to keep and perform all the covenants herein contained, such failure to perform, or breach of the said covenant, shall work an absolute forfeiture of this grant or lease, and the privileges or easements hereby given shall absolutely cease, determine and become null and void."

The court held that the defendant could not rely upon its own default as a cause for cancellation. The court, speaking on this point, said:

"It was certainly not in contemplation of the parties that the defendant might set up its own default, as a cause for cancellation. If this is so, this contract, drawn with exceptional care for the protection of the lessor, is a mere rope of sand; its obligations could only 'keep the word

of promise to the ear to break it to the hope.' It was the duty of the lessee to develop the territory by putting down a test well according to the stipulations of his contract; failing to do so, and failing also to pay the money as agreed upon, the plaintiff had an undoubted right to declare a forfeiture, but the lessee had no such right."

In *Ray* v. *Gas Co.*, 138 Pa., 576, 20 Atl., 1065, 12 L. R. A., 290, 21 Am. St. Rep., 922, suit was brought by the plaintiff *in assumpsit* to recover certain sums stipulated in a gas and oil lease for delay or default in operating the lease. The forfeiture clause was as follows:

"And a failure to complete one well, or to make any such payment within such time and such place, as above mentioned, shall render this lease null and void, and to remain without effect between the two parties."

The lessee failed to complete a well, or to make payments of rents and royalties according to the terms of the lease, and undertook to set up its default as a defense to plaintiff's action to recover the rents and royalties due him under the lease by reason of defendant's failure to comply. The court, in disposing of this defense, said:

"No case has been brought to our notice in which the lessee was allowed to take advantage of his own wrong, or to set up his own default to work a forfeiture of his own contract. It must be conceded, however, that, if the old rule is the right one, this anomalous result must ensue. Persons may perhaps contract expressly in this form, and to this effect. When they do, the transaction amounts to a mere option, and the lessee, in setting up his own default, simply avails himself of an elective right secured

to him in his contract. We do not understand the contract in suit to be of this character. The clear purpose of the lessor was to have his land operated for oil or gas, and the condition was inserted for his benefit. While the obligation on the part of the lessee to operate is not expressed in so many words, it arises by necessary implication."

In *Evans* v. *Consumers' Gas Trust Co.* (Ind.), 29 N. E. 398, 31 L. R. A., 673, the same rule is announced. In that case it was held that a provision in an oil and gas lease that it should be null and void upon the failure of the lessee to perform his agreement is no defense to him for breach of his agreement, but merely gives the lessor an option to declare it void for that reason. In that case the lessee was obligated to complete a well on the premises within ninety days from the date of said lease, and in case of failure to complete such well in such time, the lessee obligated himself to pay to the lessors for such delay a yearly rental of $250 on the leased premises from the time specified for completing such well until such well should be completed; that the said yearly rental, amounting to $250, should be deposited to the credit of the lessors in the Citizens' Bank of Noblesville, or paid direct to the lessors; and that a failure to complete such well or to make such deposit or payment as specified should render the lease null and void and to remain without effect between the parties thereto. The defendant contended that a proper construction of the lease gave it the option to avail itself of the benefits of the contract or not, as it chose; and, having failed to avail itself according to the

terms of the contract and within the time limit, the right to do so expired, and the contract became a nullity. It was also insisted that the contract was not properly a lease, but merely a contract between the parties for the doing of certain things and the payment of certain sums of money, and that the failure of the defendant to perform it not only forfeited its rights under it, but relieved it of liability.

The court ruled adversely to the defendant's contention, holding that the stipulation that the failure of the lessee to perform should render the lease void was inserted wholly for the benefit and protection of the lessor, and that it was optional with him as to whether he would avail himself of his right to declare the lease forfeited. The court held that this was true whether the instrument be regarded as a lease or a mere license.

To the same effect is the ruling of the court in *Woodland Oil Co.* v. *Crawford,* 55 Ohio St., 161, 44 N. E., 1093, 34 L. R. A., 62, and in *Hanley Falls Creamery Co.* v. *Milton Dairy Co.,* 126 Minn., 226, 148 N. W., 46, 52 L. R. A. (N. S.), 718.

In the case last cited it was held that, while formerly a provision in a lease to the effect that it should become "void" upon the tenant's default in the performance of stipulations was construed as a limitation, it was soon discovered that in practical application this enabled the tenant to nullify the lease merely by taking advantage of his own default, and that the great weight of the more recent authorities hold that whatever the form of the language used, whether adapted to the creation of a special

limitation or a condition subsequent, such will be construed as the latter, unless a contrary intent is clearly expressed.

Counsel for the defendant do not, in their brief, cite any case taking a contrary view to the rule announced in the foregoing cases, and we do not believe that any recent authority can be found which supports the defendant's contention and the holding of the chancellor that a lessee can set up his own voluntary default as a defense to an action brought against him for his breach of contract, and we think the authorities above cited conclusively show that the lessee has no such right under forfeiture clauses of the character of the one involved; but such clauses are construed and held to be for the benefit of the lessor, who can or not, as he chooses, take advantage of the rights given him by such clause upon the lessee's failure to perform the lease. The language contained in the forfeiture clause of the lease under consideration is no broader than the language contained in the forfeiture clauses referred to in the cases cited above, and does not confer on the defendant the right to make default, and then set up such default as a defense to complainant's action.

We think, by the terms of the lease, the defendant was obligated to mine the phosphate and phosphate-bearing rock from said area of land as long as it could be found in paying quantities, and that if this could not be done within the five years, the time mentioned in the lease, then the defendant was obligated to continue mining until the phosphate and phosphate-bearing rock "in paying quantities" were entirely removed. We think the lease obli-

gated the defendant to actively and in good faith mine said minerals from the land until the entire deposit was removed, provided they could be found "in paying quantities." We think that such was the contemplation of the parties clearly appears from the terms of the lease.

It is said that the contract involved in the instant cause is not a lease, but is only a license.

We think the rule is the same whether the contract be a lease or a license. However, the contract in question conveyed to the lessee the exclusive right to mine and remove all the phosphate and phosphate-bearing rock contained in the area of land described in the contract. This being true, an interest in the land passed—a corporeal interest, which could be assigned, divided, or dealt with as any other interest in the land. *Stanton* v. *Herbert & Sons,* 141 Tenn., 447, 211 S. W., 353.

It is next said that there is no privity of contract between complainants and the defendant.

The defendant obligated itself under the assignment from Craik and Priest (original lessees) to assume and discharge all obligations to the owner of the land, including the agreement to mine a minimum amount of phosphate and phosphate-bearing rock each month, or pay a minimum royalty, and in addition agreed to pay Craik and Priest a profit royalty of fifty cents per ton. Craik and Priest assigned their rights under said lease to complainants, which they had the legal right to do, and complainants, by virtue of said assignment, became vested with all the rights which Craik and Priest had in said lease.

While the chancellor's decree broadly states that the demurrer was sustained in its entirety, his written opinion indicates that he did not pass upon the first ground of the demurrer.

We might say, in disposing of this ground of the demurrer, that the bill seeks no relief whatever against the Blue Grass Phosphate Company, and therefore that company was not a necessary part to the suit. The bill simply seeks to recover damages of the defendant, Georgia Fertilizer Company, for its breach of the lease.

The fifth ground of the demurrer goes to the eleventh paragraph of the bill, and makes the point: (1) That the allegations of his paragraph are too vague, general, and indefinite to give complainants any right of action, or to require any answer; and (2) because defendant, having the legal right to discontinue and end said lease by its terms at any time, it is wholly immaterial, and no concern of the complainants whether said Blue Grass Phosphate Company co-operated with it in effecting such termination or not; and (3) because the Blue Grass Phosphate Company is not a party to the suit, and such an issue cannot be made and determined in its absence.

We do not think that the allegations of said paragraph are too vague or indefinite. They may, however, become immaterial upon the hearing of the cause upon its merits But they are not immaterial for the reason that the defendant had the legal right to terminate the lease by its terms at any time, for it had no such right, nor is the Blue Grass Phosphate Company a necessary party to the suit,

Bates v. Georgia Fertilizer Co.

because, as before stated, the bill seeks no relief whatever against that company.

It results that the decree of the chancellor will be reversed, and the cause will be remanded for further proceedings.