**PABST et al. v. ROXANA PETROLEUM CORPORATION et al.***

No. 9668.

Court of Civil Appeals of Texas. Galveston.

March 8, 1932.

Dissenting Opinion March 16, 1932.

Rehearing Denied June 7, 1932.

Stewart & DeLange, of Houston, and Stewarts, Harris & Watkins, and Jules Damiani, all of Galveston, for appellants.

Thompson, Mitchell, Thompson & Young, Truman Post Young, and Claude P. Berry, all of St. Louis, Mo., for appellee Roxana Petroleum Corporation.

John M. Corbett, of Bay City, and Lewis Jeffrey and Terry, Cavin & Mills, all of Galveston, for appellee Texas Gulf Sulphur Co.

LANE, J.

On the 21st day of September, 1925, Fred C. Pabst entered into a written contract with Roxana Petroleum Corporation, which later changed its name to Shell Petroleum Corporation, by the terms of which it was agreed between Pabst and said corporation that, in consideration of the payment by the corporation to Pabst of the sum of $1,250, and in consideration of certain covenants and agreements set out in such contract, Pabst leased to said corporation for the purpose only of exploring, prospecting, mining, and operating for oil, gas and sulphur, a certain tract of land situated in Brazoria county, Tex.; it being the north half of a strip of land containing 50 acres, and which was about 400 feet in width. By the terms of the contract of lease, the lessee is permitted to lay pipe lines, build tanks, power stations, and such other constructions as were necessary to take care of any minerals as might be produced from said land.

Other parts of the contract pertinent to the controversy between the parties to the suit hereinafter mentioned are as follows:

"It is agreed that this lease shall remain in force for a term of One (1) year from and after the 21st day of September, 1925, and as long thereafter as oil, gas or sulphur, or either or any of them, is produced from said land by the lessee. It is, however, expressly

---

agreed that if, at the expiration of said one (1) year from and after said 21st day of September, 1925, the lessee shall be conducting drilling operations on said land this lease shall remain in force so long as such operations are prosecuted with reasonable diligence, it being provided as to such thus continuing operations that a period of sixty (60) days only shall be allowed to elapse between the completion of one well and the commencement of another, and if any well or wells thus drilled prove to be productive of oil, gas or sulphur, or either or any of them, the completion of such well or wells shall take effect by relation as if said well or wells had been completed before the expiration of said one (1) year period, and the lessee, shall thereupon become vested with a leasehold estate in the said land so long as oil, gas or sulphur, or either or any of them, shall be produced thereon, subject to the payment of royalties as hereinafter provided.

"In consideration of the premises the said lessee covenants and agrees:

"First: To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth ($\frac{1}{8}$) part of all oil produced and saved from the leased premises.

"Second: To pay the lessor a royalty equal to the value of one-eighth ($\frac{1}{8}$) where gas only is found, while the same is being used off the premises. Lessor to have gas free of cost from any such well for all inside stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense.

"Third: To pay lessor for gas produced from any oil well and used off the premises, or if used for the manufacture of gasoline or any other product, a royalty equal to the value of one-eighth ($\frac{1}{8}$) of the raw gas, payable monthly at the prevailing rate.

"Fourth: To pay lessor for all sulphur mined and marketed from said land a royalty of $1.00 per ton.

"If during the term of this lease, and prior to the production of oil, gas or sulphur in paying quantities on the land hereby leased, there shall be drilled on adjoining land, and within two hundred (200) feet of any boundary line of said leased land a well which shall produce oil in paying quantities for thirty (30) consecutive days, lessee, within ninety (90) days thereafter, shall begin and prosecute the drilling of an offset well on said leased land in a faithful effort to find and produce oil therefrom.

"If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided shall be paid the lessor only in the proportion which his interest bears to the whole and undivided fee.

"In the case of the surrender of this lease or the forfeiture thereof, or the expiration of the rights of lessee, for any reason, either at the end of said period of one (1) year or otherwise, the lessee, its successors and assigns, shall have a reasonable time after the expiration, surrender or forfeiture thereof in which to remove all machinery, pipe lines, casing, pumps, tanks, telegraph poles and telegraph lines and all other property whatsoever which the lessee, its successors or assigns, may have placed upon said lands. * * *

"It is agreed that the estate of either party hereto may be assigned in whole or in part. The covenants, obligations and considerations of the within lease shall extend to and be binding upon the parties hereto, their heirs, executors, administrators, successors and/or assigns, but no change in the ownership of said land or assignment of rentals or royalties, or any part thereof, shall be binding on the lessee until after the lessee has been furnished with a written transfer or assignment or a true copy thereof; and it is hereby agreed in the event this lease shall be assigned as to a part or parts of the above described lands and the assignee or assignees of such part or parts shall fail to make default in the payment of the proportionate part of the rent due from him or them, such default shall not operate to defeat or affect this lease insofar as it covers a part or parts of said lands as to which the said lessee or any assignee thereof shall make due payment of said rental."

After the execution of the contract above mentioned, Fred C. Pabst sold and conveyed to W. F. Pabst and wife, Viola C. Pabst, George Murphy and wife, Nina Pabst Murphy, certain interests in and to the property described in said contract.

On the 22d day of August, 1928, Fred C. Pabst and the parties to whom he made sales, as above stated, brought this suit against Roxana Petroleum Corporation, hereinafter called Roxana Company, and Texas Gulf Sulphur Company, hereinafter called Sulphur Company. The plaintiffs went to trial on their third amended original petition to which the court sustained a general demurrer addressed to it, and, upon refusal by plaintiffs to amend, the court dismissed the suit. From the action of the court in sustaining the demurrer and dismissing the suit, plaintiffs have appealed. Appellants for reversal of the judgment contend that the court erred in sustaining the general demurrer to their petition.

We overrule such contention.

After alleging the execution of the contract between Fred C. Pabst and the Roxana Company, it is by the petition alleged that Pabst was induced to enter into such contract by reason of certain misrepresentations

made to him by Roxana Company. By paragraph 3 of the petition it is alleged that the Roxana Company did discover sulphur in paying quantities, and informed Pabst that it had done so, and that it had transferred and assigned said lease and all its rights as to sulphur under his land to the Sulphur Company.

By the sixth paragraph it is alleged as follows: "That defendants suppressed and hid the information they had obtained from drilling on said land from said plaintiffs herein, and refused to disclose their discovery to plaintiffs."

By paragraph 4 it is alleged that: "Said Texas Gulf Sulphur Company thereupon entered on said land and discovered sulphur thereunder as had said Roxana Petroleum Corporation. That four wells were drilled on said land by said Roxana Petroleum Corporation and said Texas Gulf Sulphur Company, each being productive of sulphur, and discovering a stratum of sulphur more than 30 feet thick underlying the entire tract of land, and containing sulphur to the extent of ten million tons. Both said corporations had drilled numerous wells on surrounding properties and discovered sulphur in paying quantities over the entire area known as Clemens Dome."

By the seventh paragraph they allege that the Roxana Company and Sulphur Company became jointly and severally interested by some contract between them, the exact terms of which were unknown to the plaintiffs, "whereby said defendants having discovered sulphur on the property of said Pabst and on adjoining property on said Clemens Dome, did conspire between themselves to defraud plaintiffs, and set about as a result of the conspiracy * * * to prevent plaintiffs from ever receiving any royalties on, or recovering the sulphur under plaintiffs' land and have succeeded in so doing."

Proceeding to show the acts done in furtherance of the alleged conspiracy, they alleged that the Sulphur Company, through its agent, represented to Fred Pabst that defendants believed that sulphur might be found in paying quantities on the Clemens Dome; while they well knew that such sulphur had, in fact, been found under said land; that they alleged that defendants represented to Fred Pabst that, for the purpose of developing sulphur under his land and adjoining lands, it was desired that all lands on the dome be combined into one consolidated tract; that it was their purpose to consolidate such lands into one tract for the purpose of mining sulphur; that to carry out such purpose they proposed to Pabst that he change his contract of September 21, 1925, so that same would be held by Roxana Company in connection with several hundred acres of adjoining land; that it was proposed by such proposed change that

Pabst would receive as royalty such proportion of the sulphur produced from the whole of the consolidated tract as 25 acres would bear to the entire acreage to be included in the consolidation; that Pabst declined to enter into the scheme proposed; that, as an inducement to Pabst to agree to make the proposed change in his contract, defendants represented to him that, in order to produce sulphur from his land, it would be necessary to erect steam plants of large capacity at an expense of several million dollars, and that this would be done if he (Pabst) would sign the new agreement proposed by them; that Pabst still declined to enter into such proposed agreement; that a large number of persons owning land on the dome did sign the proposed agreement; that by such conspiracy, and by their refusal to drill and produce sulphur from the Pabst land, the defendants have succeeded in so tying up the land adjacent to the Pabst land as to prevent Pabst from producing sulphur from his land.

By the twelfth paragraph it is alleged that, after the execution of the contract of September 21, 1925, defendants entered into a contract hereby they mutually agreed to jointly for their benefit and for the benefit of Pabst carry out the terms of the lease contract; that thereafter the Sulphur Company drilled three wells on the Pabst land, and discovered that there was underlying said land a large deposit of sulphur; that by diligent work sulphur could be produced in large and paying quantities; that, had such production been had, plaintiffs would have been paid a large sum of money under the terms of said lease contract, yet, notwithstanding said discovery of sulphur, no bona fide effort has been made by defendants to produce such sulphur.

They alleged that defendants have no intention of producing sulphur from the Pabst land; that, by reason of the actions of defendants above stated, plaintiffs have been injured in the sum of $10,000,000; that plaintiffs are entitled to specific performance of the lease contract and for an order requiring defendants to develop said leased land, and to produce sulphur therefrom.

They alleged that defendants entered upon the Pabst land under the lease and drilled a well in September, 1926, in which sulphur was found in paying quantities; that for the purpose of keeping the lease alive defendants entered into a conspiracy to drill another well and to continue such drilling on such well until September 18, 1927; that defendants completed the drilling of another well on said land on December 11, 1927, and therein found sulphur in paying quantities; that the Sulphur Company drilled another well to completion on the 21st day of February, 1928, and therein found sulphur in paying quantities; that by the execution of the lease of September 21, 1925, the Roxana

Company obligated itself to drill wells on said land and to prosecute such drilling with reasonable diligence; that the Sulphur Company informed plaintiffs that wells drilled on said land, as well as the wells on surrounding territory, proved to be productive of sulphur.

They alleged that Fred Pabst was ejected from one of the derricks being used by an employee of the Sulphur Company in drilling a well on the leased land, and refused to let Pabst inspect the well; that such employee told Pabst that he had orders from the Sulphur Company to permit no one not engaged in the drilling to come about the well being drilled.

They alleged that, by the purchase of the lease from Follett, the Roxana Company got control of the south half of the Pabst tract, and that at the time of this suit it was in possession thereof. They alleged that in the operation for sulphur it is necessary to drill wells and to force hot water into the earth which flows from the well into which it is pumped a distance of more than 400 feet; that by reason of this fact that defendants had acquired a community undivided interest in the sulphur underlying the land on all sides of the Pabst tract; that, while holding the lease on the Pabst tract and the interests in the sulphur on the surrounding tracts, they purchased from the owners of the surrounding tracts, adjacent to the Pabst tract, an undivided interest in the sulphur underlying the surrounding tracts; that the result of the facts stated was to defeat any attempt that might be made at any time by plaintiffs to develop sulphur on leased land. They alleged that they did not know that defendants were purchasing rights, titles, and interests in the sulphur underlying the adjacent and surrounding lands from the owners thereof; that the fact that such undivided shares in such underlying sulphur had been placed in different owners had the effect of tying up the property so as to prevent further negotiations with any other company for the development of the property of plaintiffs; that the effect of the method employed and acts done by defendants was to entirely and forever prevent the production by plaintiffs of sulphur on the Pabst land, and the effect of defendants' acquisition of the sulphur under the surrounding tracts on the Clemons Dome was to tie up the dome and prevent operations by any one except defendants thereon; that they Roxana Company still holds some leases on the dome, but has released other leases thereon; that an agreement was entered into between defendants by which plaintiffs and all owners of lands on the dome would be induced to come into what was called a community lease, which, if it had been put into effect, would have been to indefinitely postpone pro-

duction of sulphur and thereby materially damage the rights of plaintiffs.

By the twenty-first and twenty-second paragraphs of the petition it is alleged as follows:

"21. The one and only method of extracting and producing sulphur from structures such as Clemens Dome is to force superheated water under high pressure down into wells, drilled thereon and cased with iron pipe, and thereby through heating same, melt the sulphur under ground, and it is such sulphur so melted that flows as a liquid to the well and up through an iron pipe to the surface. Such melting of the sulphur takes place as far as the hot water spreads laterally under the ground from the well into which the water is pumped at high pressure. Such hot water so spreads to a distance of more than 1,000 feet from the well in every direction. There is no means of preventing such spreading of the water and no means of preventing the melting of the sulphur surrounding the well to a distance of more than 1,000 feet therefrom. There is no means by which the sulphur under the 25 acres described in said lease of September 21, 1925, can be extracted other than by pumping such heated water into wells drilled thereon and no means to prevent such hot water from flowing onto and invading the sulphur underlying the adjoining tracts of land and melting and causing such sulphur to flow to and come up into and be taken from the well so drilled on said Pabst 25 acres.

"22. That Roxana Petroleum Corporation, while holding the lease on said Pabst 25-acre tract, held leases on the lands lying north, south, east and west of and adjoining said 25-acre tract of Pabst, which leases were similar to the lease on said 25 acres and said Roxana Petroleum Corporation was vested with and had full right to produce sulphur from all said area and to account of each of the lessors for the royalty on the sulphur produced from each tract without any conflict or trespass. That after the purchase by the Roxana Petroleum Corporation of the undivided interests in the sulphur under the tracts adjoining the said Pabst 25-acre tract, and bringing about the vesting of the ownership of such sulphur in undivided interests in others as hereinbefore recited, said Roxana Petroleum Corporation abandoned such leases on the surrounding lands and on said Pabst tract described in said lease of September 21, 1925; and its purpose and the effect thereof was to create such a condition as to effectually prevent the obtaining or producing of sulphur from said Pabst 25 acres. That one of the methods of preventing production from and of destroying all value of the sulphur under a tract of the size and shape of said Pabst 25-acre tract, is to secure a lease on such tract and while holding

lease on same and holding leases on surrounding property to acquire and have others acquire by purchase undivided interests in the sulphur under such surrounding tracts, and then abandon the leases, and by such arrangement is brought about a condition under which the owner of such tract cannot produce or obtain sulphur from his own land, though same could have been produced by such lessee so long as the leases were continued in effect on such tract and the tracts surrounding same."

In the twenty-sixth paragraph of the petition it is alleged that, in violation of its duties to deal honestly and fairly with the owners of the Pabst tract, defendants abandoned and surrendered the leases on the adjoining property after having acquired such undivided interests in the sulphur underlying same, leaving certain other undivided interests in other persons; that they thereby placed it beyond their power to produce sulphur from the Pabst tract, and thereafter, and after having drilled the last well on the Pabst tract in February, 1928, they abandoned the lease on said Pabst tract, and thereby plaintiffs have been effectually and forever prevented from removing sulphur from under their land, and by the Roxana's refusal to develop and produce sulphur from under their land, and in surrendering and abandoning its leases on adjacent lands and by its having acquired undivided interests in the sulphur under said land adjacent to their land, leaving other undivided interests owned by others they have been greatly damaged; that such acts on the part of defendants were for the purpose of preventing the production of sulphur from the Pabst tract, and does have such effect; that such acts were done as the result of defendants' conspiracy together in order that the entire sulphur on the dome, including that under the Pabst tract, "would be effectually tied up and prevented from being placed on the markets of the world until defendants could force plaintiffs to sell to defendants a share and interest in the sulphur under the Pabst tract and until plaintiffs were forced to agree to the community scheme proposed by defendants."

They alleged that defendants kept possession of the Pabst tract until April 19, 1928, at which time the Roxana Company tendered to plaintiffs a release of the lease of September 21, 1925; that plaintiffs refused to accept such release, and upon such refusal defendants abandoned said Pabst tract.

Paragraphs 29 and 30 of the petition are as follows:

"29. The action of defendants and each of them, hereinbefore set forth, were wrongful and done maliciously for the purpose and had the effect of destroying plaintiffs' property in said sulphur and defendants, and each of them, are liable to plaintiffs for exemplary damages in the sum of $250,000.00.

"30. Wherefore, plaintiffs pray judgment against defendants, jointly and severally, for their damages (a) for the entire value of $1.00 per ton on all sulphur underlying said tract; (b) for their exemplary damages; (c) for interest at 6 % per annum on said sums; and in the alternative, for the sum of $1.00 per ton on all sulphur said defendant, and each of them, should have produced to date of trial, with interest thereon at 6% per annum, and for costs, equity and general relief."

The petition is so incumbered with a great mass of irrelevant, immaterial, inconsistent, and redundant allegations, pleadings of evidence, and argument of counsel that we are unable to copy it, verbatim, into this opinion without extending it to an unreasonable length. We have therefore made a statement which we deem a fair statement of all the allegations, material and relevant to the question submitted for our determination, which is, Did the trial court err in sustaining the general demurrer addressed to the petition, and in dismissing the suit upon the plaintiffs' refusal to amend?

We think the trial court as well as defendants were entitled to have the plaintiffs present in their petition a statement of the facts constituting their cause of action in a logical form without interspersing therewith arguments and conclusions of fact by counsel, and that, upon their refusal to make such statement upon demand therefor by the court and defendants, the court had authority to dismiss the suit.

The court and defendants were entitled to a petition stating the facts relied upon for recovery with such certainty as to reasonably advise him and them of the facts relied upon for recovery. Article 1997, Revised Civil Statutes of 1925; Negociacion Agricola, etc., v. Love (Tex. Civ. App.) 220 S. W. 224, at column 2, page 228; section 2, Rules for District and County Courts; Mayton v. Texas & P. R. Co., 63 Tex. 77, 51 Am. Rep. 637.

By article 1997, Revised Civil Statutes of 1925, it is provided that petitions in all civil suits shall consist of a statement in logical and legal form of the facts constituting the plaintiff's cause of action.

Plaintiffs' third amended petition, upon which they went to trial, covers 44 pages of the transcript. Its numerous paragraphs are so confused, contradictory, and inconsistent, and so interspersed with argument of counsel and pleadings of evidence as to destroy it as a petition consisting of a statement in logical form of facts constituting any definite cause of action. It is by no means a logical statement of any definite statement of facts constituting a cause of action. We are unable to ascertain from the petition, with any degree

of certainty, upon what facts plaintiffs base their demand or demands for a recovery, and we have no doubt that the trial court was as much at a loss to discover such facts as we are. We think it fair to state that the petition may reasonably be construed as one attempting to present a suit in equity, an action at law for breach of contract, an action to enforce specific performance of contract, or an action for tort, without any alternative allegations. Averments undertaking to set up a cause of action should be certain and positive, and not left to argument or inference. While the plaintiffs have in numerous parts of their petition alleged that defendants entered into a conspiracy which they carried into execution, to plaintiffs' injury and damage, the facts alleged as constituting such conspiracy do not show a conspiracy. The facts alleged cannot be distorted from their true meaning, and, when given such meaning, they fall far short of showing a conspiracy. It seems to us that the defendants were in their rights in the doing of the things asserted by plaintiffs as showing a conspiracy to injure plaintiffs.

Having already quoted article 1997 of the Statutes, we will not repeat such quotation here.

Section 2, Rules for District and County Courts, provides as follows: "2. Pleadings, with the exception of those presenting issues of law, must be a statement of facts, in contradistinction to a statement of evidence, of legal conclusions, and of arguments. * * * In case of a violation of this rule, to such an extent as to produce confusion, uncertainty and unnecessary length in pleading, the court may require the matter set up to be repleaded, so as to exclude the superfluous parts of it from the record."

Section 32 of such rules provides: "The court shall not be required to allow a case to go to trial on the facts, when the pleadings are obviously so defective that a material issue has not been formed, and in such case the court shall call the attention of the parties to such immaterial or defective issue, so that the time of the court may not be wasted."

In Negociacion Agricola, etc., v. Love (Tex. Civ. App.) 220 S. W. 224, 228, at the bottom of column 2, page 225, it is said that: "It is the duty of a pleader to state the facts upon which he relies to support his cause of action or defense with such certainty and accuracy as will identify the very transaction on which reliance for recovery is based."

In Hollis v. Chapman, 36 Tex. 1, it is said: "Every action being a special action on the particular case, the petition should set forth 'a full and clear statement of the cause of action,' without ambiguity or contradiction, and also a clear statement of the relief sought. A petition may, therefore, be so framed as to declare on a special contract, and in any other form, so that the same is clearly intelligible, and not contradictory."

In Mayton v. Texas & P. R. Co., 63 Tex. 77, 51 Am. Rep. 637, it is said: "The petition lacks an element which is essential to all good pleading—'certainty to a common intent.' It does not clearly inform the defendant of the issue which is to be met. On this account the demurrer was properly sustained."

The petition in some parts alleges that defendants informed Pabst that they had discovered sulphur in paying quantities on the Pabst tract and in other parts thereof that they concealed such information from Pabst. It is charged that defendants leased lands adjacent to and in the vicinity of the Pabst tract, and that, after obtaining such leases, unknown to plaintiffs, defendants purchased from the owners of such adjacent and vicinity lands their royalties, and that, after such purchases, defendants abandoned the lease obtained by Roxana Company from Pabst. It is charged that such acts constitute a conspiracy and intended as such to tie up the Pabst tract so as to prevent the production of the sulphur under the same.

We do not think that the things alleged, if true, would show the alleged conspiracy. There can be no question but what defendants had the right, without the knowledge or consent of plaintiffs, to lease the adjacent lands in the vicinity to the Pabst tract, to purchase the royalties mentioned, and to abandon their lease on the Pabst tract and on the adjacent tracts. They were clearly within their rights in doing such acts. The taking of leases on the land adjacent to the Pabst tract, and the subsequent abandonment of such leases, did not place the Pabst tract in any worse position than it was prior to the lease of it by the Roxana Company, for, if such tract was so tied up as to prevent the production of sulphur therefrom by the abandonment of the leases on adjacent land by defendants, it was also so tied up while such adjacent land was in possession of its owners prior to the taking of the lease of the Roxana Company on the Pabst tract and on such adjacent land.

In paragraph 14 of the petition it is alleged that by reason of the actions of defendants plaintiffs have been damaged in the sum of $10,000,000, and that plaintiffs are entitled to specific performance of said contract above set out, and for an order requiring defendants to develop said land leased, and to produce sulphur therefrom.

In two more sections they allege that a wrongful assault was made on Fred Pabst. In numerous paragraphs it is alleged the defendants entered into and carried to a success a conspiracy to plaintiff's injury and damage, and in the closing paragraph plaintiffs pray for recovery against defendants jointly and severally for $1 per ton on all sul-

phur underlying the Pabst 25-acre tract, which they allege was ten million tons, and that, if it be held that they are not entitled to such recovery,·then that they may recover $1 per ton on all sulphur which defendants should have produced to date of trial. .

The petition ·is an omnibus pleading. It consists of a general hodgepodge of statements, immaterial, irrelevant, inconsistent, and redundant. There is no effort to connect up the allegations in any consistent theory. There seems to be no effort to tell either the court or defendants clearly the nature of their complaint nor of the real nature of the remedy to which they conceive themselves to be entitled. If plaintiffs have a cause of action, they should be able to state it in some logical and consistent form so as to give the defendants notice as to what is the real nature of their complaint. This the petition does not do.

We agree with appellees that the plaintiffs should not be allowed to inflict a petition such as theirs in the present case upon the court or upon opposing parties.

For the many reasons pointed out, we have reached the conclusion that the trial court was justified in sustaining the general demurrer to the petition, and upon refusal of plaintiffs to amend, in dismissing plaintiffs' suit.

The judgment is affirmed.

Affirmed. ·

GRAVES, J. (dissenting).

The dissent rests, in the main, upon these conclusions:

(1) "A general demurrer is a suggestion to the court that the facts stated in the pleading demurred to, if true, do not entitle the pleader to any relief from the court. This does not raise any question as to the manner and form of pleading, but only as to the substance, and if upon a fair, reasonable construction, giving to all ambiguities the reasonable interpretation most favorable to the pleading, there appear in it sufficient facts to show a legal right in the pleader, the general demurrer should be overruled." Townes' Texas Pleading (2d Ed.) bottom page 530 and top 531; Zacharie v. Bryan, 2 Tex. 274; Lambeth v. Turner, 1 Tex. 364; Holman v. Criswell, 13 Tex. 38; Williams v. Warnell, 28 Tex. 611; Mayfield v. Averitt's Adm'r, 11 Tex. 140; Junction City School · Incorporation v. Trustees of School-District No. 6, 81 Tex. 152, 16 S. W. 742.

(2) The plaintiff's petition in this instance, while unduly long and in places somewhat involved, when given the benefit of the liberal rule of interpretation thus obtaining under the blended system of law and equity extant in Texas, does state a good cause of action in at least one respect, to wit: For the recovery of damages for the failure of the defendants,

after having discovered sulphur ·in paying quantities under the land on October 19th of 1926, to produce or pay royalty on any of it between that date and April 19th of 1928, when, although they had still retained possession thereunder throughout the intervening one and one-half year period, they attempted to rid themselves of all responsibility to the plaintiff under the lease contract by surrendering or abandoning it.

(3) The sole considerations to the plaintiff for the lease were the payment of $1,250 in cash, and the expectation on his part that sulphur would be found and produced, together with the several expressed "covenants and agreements" "to be paid, kept, and performed" by the lessee, one of which was: "To pay Lessor for all sulphur mined and marketed from the land a royalty of $1.00 per ton"; the only purpose of the grant from him, by express recitation, was that of conferring upon the lessee the exclusive right to use the land in exploring for and in the mining of oil, gas, and sulphur, and, in case any of these was found in paying quantities, by the plain import of its provisions as a whole, the mutual contemplation of both parties was that there would be a prompt "mining, saving, and taking care of such product"; to that end, the fixing of its duration, the statement of what was expected of the lessee in going'· about the attainment of such joint expectations, and the vesting of the interests thereunder, was thus further expressed: "This lease shall remain in force for a term of one year after September 21 of 1925," and "as long thereafter as oil, gas, or sulphur, or either of them, is produced from said land by the Lessee. It is, however, expressly agreed that if, at the expiration of said one (1) year from and after said 21st day of September, 1925, the Lessee shall be conducting drilling operations on said land, this lease shall remain in force so long as such operations are prosecuted with reasonable diligence, it being provided as to such thus-continuing operations that a period of sixty (60) days only shall be allowed to elapse between the completion of one well and the commencement of another, and if any well or wells thus drilled prove to be productive of oil, gas, or sulphur, or either or any of them, the completion of such well or wells shall take effect by relation as if said well or wells had been completed before the expiration of said one (1) year period, and the Lessee shall thereupon become vested with a lease-hold estate in the said land so long as oil, gas, or sulphur, or either or any of them, shall be produced thereon, subject to the payment of royalties as hereinafter provided."

There is on the one hand no clause expressly requiring the production of sulphur if or when found, nor, on the other, one likewise according a right in any event to surrender or abandon the contract.

(4) Thus, after the expiration of the one year, the principal, if not indeed the sole, consideration to the lessor for permitting the lease to longer "remain in force" was the specified $1 per ton royalty "for all sulphur mined and marketed from the land," and, in turn, likewise by express stipulation, the only way the lessee could so preserve and thereafter prolong its life was to be at the time the year expired actually "conducting drilling operations" thereon, which it henceforth had to continuously "prosecute with reasonable diligence" to the completion of one well after another, according to a stipulated measure and with a stated vesting of estate, or else suffer an ever-impending termination of the grant.

(5) It is in effect further averred that the lessee and its assignee, the Sulphur Company, to whom it had, with notice thereof going to appellant, transferred and assigned an interest in the sulphur rights under the lease, were so conducting drilling operations when the one year expired, discovering sulphur in paying quantities under the land as early as October 19th of 1926, according to paragraph 23 of the demurred-to petition, and finding the deposit of that mineral therein so rich that, if they had then used reasonable diligence in realizing upon the discovery, they could and should thereafter have produced 100,000 tons thereof per month, beginning with January 1st of 1927, but instead of doing so, negligently, fraudulently, and in the utmost bad faith toward lessor, not only designedly withheld the production of any at all, but all the while pursued their preconceived purpose and plan of really preventing any mining of sulphur anywhere on Clemens Dome, inclusive of plaintiff's land; that meanwhile, although at first, when endeavoring to induce a change in the existing lease, having once informed him of their discovery of it in paying quantities on his tract, they then suppressed and hid from him all information showing the extent of their findings, the actual amount of sulphur disclosed, the location and logs of the different wells, and even excluded him from the premises, when he went there seeking to find out about the progress of developments thereon; finally, in his verbis:

"That said Roxana Petroleum Corporation and said Texas Gulf Sulphur Company and each of them retained possession of the 25 acres described in said lease of September 21, 1925, until April 19, 1928, when said Roxana Petroleum Corporation, in writing, undertook to absolve itself from further liability by signing and tendering a release to plaintiffs, which they refused to accept, and both defendants then abandoned said premises, after destroying all possibility of plaintiffs' ever producing sulphur therefrom by the acts hereinbefore set forth."

(6) The finding of sulphur in such highly paying quantities as is thus directly and unequivocally alleged, which must accordingly be accepted as true in fact, imposed upon the appellees—at least for the subsequent one and one-half years they retained possession of the land, and wholly irrespective of any right they may have had to either surrender the lease or abandon their interest thereunder at the end of that period—two clearly implied legal obligations toward the appellant:

(1) To use reasonable diligence to produce, save, and pay him his stipulated royalty on all sulphur it could in that manner have mined from his land. Mills and Willingham, Law of Oil and Gas, pars. 102, 105, 108, 110, and footnote cited authorities; Thuss, "Texas Oil and Gas," par. 128 and cited authorities; Thornton on "Oil and Gas," vol. 1, par. 111; Texas & P. Coal & Oil Co. v. Stuard (Tex. Civ. App.) 269 S. W. 482; Id. (Tex. Civ. App.) 7 S.W.(2d) 878; Freeport Sulphur Co. v. American Sulphur Royalty Co. 117 Tex. 439, 6 S.W.(2d) 1039, 60 A. L. R. 890; Texas P. C. & O. Co. v. Barker, 117 Tex. 418, 6 S.W. (2d) 1031, 60 A. L. R. 936; Bates v. Georgia Fertilizer Co., 144 Tenn. 32, 229 S. W. 153; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27, at page 29 (4).

(2) To use good faith toward him, not only in first duly testing the property for the existence of sulphur, but further in thereafter operating it in his interest, along with their own, to the end that he might receive the royalty it was capable of yielding. Summers, "Oil & Gas," p. 431; Merrill's "Covenants Implied in Oil & Gas Cases," par. 112, p. 266; Thuss on "Texas Oil and Gas," p. 154; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.(2d) 1039, 60 A. L. R. 890; Humphreys Oil Co. v. Tatum (C. C. A.) 26 F.(2d) 882; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801; Kline v. Wright (D. C.) 51 F.(2d) 564; Poe v. Humble Oil & Refining Co. (Tex. Civ. App.) 288 S. W. 264, 265; Texas Co. v. Roos (C. C. A.) 43 F.(2d) 1.

(7) There is, too, as before indicated, affirmative charge that both of these duties toward him were negligently, fraudulently, and wholly disregarded, to his damage in at least the sum of $1 per ton on 100,000 tons of sulphur per month for the whole of the year 1927, and the first three and one-half months of 1928; his right to damages ensued perforce (Waggoner Estate v. Sigler Oil Co., and other authorities cited, supra), and, if this was not the true measure thereof, the facts relating to it were fully pleaded, and the matter became one of law for the court. Texas P. Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, 60 A. L. R. 936; Freeport, etc., Co. v. American, etc., Co., 117 Tex. 439, 6 S.W.(2d) 1039, 60 A. L. R. 890; International & G. N. R. Co. v. Glover (Tex. Civ. App.)

84 S. W. 604; Southwestern Portland Cement Co. v. Kezer (Tex. Civ. App.) 174 S. W. 661, 669.

(8) The rationale for these two implications is the same whether the lease be one for solid or fugacious minerals, being, as to the first of them, that it is necessary to effectuate the manifest purpose of the parties in entering upon the enterprise; as to the second, that it invariably inheres in their engagements as a matter of equity and good conscience; concerning the former, it is said in paragraphs 108 and 110 of Mills and Willingham on "The Law of Oil and Gas," supra:

"An oil and gas lease is, in effect, a mining enterprise between the lessor and lessee, and from the very nature of the contract, the return to the lessor, from the reservation of the royalty, depends upon development of the land upon discovery of oil or gas. As it must be assumed that the expectation of an income accruing from such royalty was one of the considerations, if not the only consideration, that induced the lessor to enter into the lease, the purpose of the lease fails without such development. For such reason, it is universally held that the lessee, when it has been established by a well drilled upon the land that it is capable of producing oil or gas in paying quantities, is under an implied covenant to drill such number of wells as shall be reasonably sufficient to develop the lease. * * *

"Upon discovery, the lease is automatically changed from one for years into one that shall endure as long as oil or gas is produced.

"Closely related to the covenant for development is the implied obligation to operate the premises for the production of oil and gas after discovery in paying quantities has been made, and to market the product. * * * This covenant is based upon the proposition that the lessor is entitled to the royalties accruing under the lease, which is payable only from production, and a failure to produce and market by the lessee is a violation of the lessor's right."

Under the latter, the obligation of the lessee to do nothing to impair the value of the lease to the lessor is thus epitomized in Thuss, "Texas Oil and Gas," at page 154: "Since they have a community of interest, the lessees must work for the mutual advantage of both parties, so as to make the largest possible return," which doctrine is sententiously revamped by the Supreme Court of Texas (Waggoner Estate v. Sigler Oil Co. 118 Tex. 509, 19 S.W.(2d) 27, at page 32) in this declaration: "There can be no fraudulent evasion with respect to the use which keeps the [lessee's] estate alive."

(9) The completion of wells on and after October 19th of 1926, "productive of" sulphur in paying quantities vested the appellees with "a lease-hold estate in the land," that is, under the rule of decision in Texas (Waggoner Estate v. Sigler Oil Co., supra), a determinable fee susceptible of loss—either through a complete cessation of the use of the property for the purposes of the lease, regardless of their intention, or through an abandonment thereof with the intention of giving up their interest therein—but in neither contingency, since under the facts here alleged no such cessation nor abandonment occurred until April 19th of 1928, were they absolved from liability to the appellant for their violation prior to that time of their bounden obligation to him to fairly produce during the interim the sulphur they already had so abundantly found, consonantly with this pithy pronouncement of our Supreme Court in the cited Waggoner Case:

"Not only may the lessor recover minerals granted under the ordinary oil or gas lease, which remain unproduced, on cessation of mineral operations, or on the lessee's abandonment of his rights; but, where a solvent lessee is merely guilty of negligence, to the lessor's injury, in the conduct of the work of exploring, developing, producing, or marketing the minerals, the lessor may recover his damages." Summers on "Oil and Gas," edition of 1927, pars. 168 and 209; Thornton on "Oil and Gas," vol. 1, par. 161, p. 467, 40 Corpus Juris, 1098; Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N. E. 308; Galey v. Kellerman, 123 Pa. 491, 16 A. 474; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801; Double v. Union Heat & Light Co., 172 Pa. 388, 33 A. 694; Humble Oil & Refining Co. v. Strauss (Tex. Civ. App.) 243 S. W. 528.

It is accordingly submitted, not without much respect for the contrary action of the majority, that a reversal should have been ordered.

## On Motion for Rehearing.

PLEASANTS, C. J.

The majority of the court, after due consideration of appellant's motion for rehearing, feel constrained to adhere to the conclusions expressed in the opinion of Justice LANE, that the trial court did not err in sustaining defendants' general demurrers to plaintiff's petition.

The dissenting opinion of Justice GRAVES, as we understand it, is based solely on the contention that the petition is sufficient in its statement of a cause of action against defendants for damages for their failure to produce sulphur from the plaintiff's property between the date of its discovery by the defendants in paying quantities, October 19, 1926, and the date of their surrender of their leases, April 19, 1928.

█ We think it clear that appellant's right to recover damages for appellees' failure to produce sulphur from the property during

the time stated can only be based upon the alleged conspiracy of appellees to defraud appellant, and, the facts alleged in the petition being insufficient to raise an issue of such conspiracy, no cause of action is alleged against appellees for any recovery. The dissenting Justice has not disagreed with the majority of the court in the holding that the facts alleged in the petition do not support the charge of conspiracy, but bases his dissent solely upon the assumed obligation of appellees, after they discovered the sulphur, to proceed with reasonable diligence to produce it so long as they continued to hold appellant's lease of the land, and to be liable to appellant for the amount of the royalty upon the sulphur which could have been so produced. The majority of the court cannot construe the lease, which is set out in substance in Justice LANE'S opinion, as fixing such obligation and liability upon appellees. There is no express obligation imposed by the lease to explore for and produce sulphur if found under the land at any time during the term of the lease.

The provision in the lease that, "if during the term of this lease, and prior to the production of oil, gas or sulphur in paying quantities on the land hereby leased, there shall be drilled on adjoining land, and within two hundred (200) feet of any boundary line of said leased land, a well which shall produce oil in paying quantities for thirty (30) consecutive days, Lessee, within ninety (90) days thereafter, shall begin and prosecute the drilling of an offset well on said leased land in a faithful effort to find and produce oil therefrom," if it could be construed as adding anything to appellees' obligation under the lease to produce sulphur, cannot be invoked for that purpose because there is no allegation in the petition that either oil or sulphur was being produced in paying quantities from adjoining land within 200 feet of appellant's land. The petition shows that appellees paid the money required by the lease and otherwise performed all their obligations thereunder during the time they held possession of appellant's land. If they had failed to comply with these express obligations or with the implied obligation to explore and develop the land with reasonable diligence, upon which the dissenting opinion seems to be based, the only remedy for such failure which the lease gave the appellant was the right of forfeiture and repossession of the property, there being, in the opinion of the majority, no facts alleged in the petition sufficient to raise an issue of conspiracy by the appellees to defraud appellant of the value of the sulphur found under his land.

The allegations of appellant's petition disclose that appellant's tract of land upon which the lease in question was executed was one of a number of tracts or subdivisions of land what is known and designated as Clemen's Dome, under which there is a large deposit of sulphur; that in making this lease it was understood that the lessee would acquire leases from the owners of other subdivisions of land covering this dome, and would explore the dome for oil, gas, and sulphur, and, if any of these minerals were found in paying quantities and produced by the lessee, appellant would be paid the royalties stipulated in the lease; that, after the lessee had acquired leases of a number of the tracts covering this dome, and had through its sublessee, the Sulphur Company, by diligent exploration discovered sulphur in paying quantities thereon, the sublessee, Sulphur Company, informed appellant that it could not further profitably develop the dome and produce sulphur therefrom, unless its lessees agreed to execute a "community lease," which would permit each owner of a tract of land covering the sulphur deposits to share proportionately in production from any one or more of the several tracts or subdivisions of the dome under which the sulphur deposits were found. The other owners of tracts or subdivisions of the land agreed to accept this form of lease in lieu of their original leases, but appellant refused to make any change in his lease. Thereupon appellees surrendered their possession and leases to appellant and their other lessors of land upon the dome.

It is, we think, clear that upon this state of facts appellant has no cause of action against appellee. None of his sulphur has been lost or taken from him. His right to produce sulphur from his land has not been impaired by any of the alleged acts of the appellees. Borschow v. Wilson (Tex. Civ. App.) 190 S. W. 202.

Appellant's petition alleges: "The one and only method of extracting and producing sulphur from structures such as Clemens Dome is to force superheated water under high pressure down into wells, drilled thereon and cased with iron pipe, and thereby through heating same, melt the sulphur under ground, and it is such sulphur so melted that flows as a liquid to the well and up through an iron pipe to the surface. Such melting of the sulphur takes place as far as the hot water spreads laterally under the ground from the well into which the water is pumped at high pressure. Such hot water so spreads to a distance of more than 1000 feet from the well in every direction. There is no means of preventing such spreading of the water and no means of preventing the melting of the sulphur surrounding the well to a distance of more than 1000 feet therefrom. There is no means by which the sulphur under the 25 acres described in said lease of September 21, 1925, can be extracted other than by pumping such heated water into wells drilled thereon and no means to prevent such hot water

from flowing onto and invading the sulphur underlying the adjoining tracts of land and melting same and causing such sulphur to flow and come up into and be taken from the well so drilled on said Pabst 25 acres."

From these allegations it is apparent that the only paying or profitable contract for producing sulphur from a large field of deposits of that mineral held by a number of owners of small subdivisions of the land having such deposits is under a community lease such as the appellees obtained from the other members of various subdivisions of this sulphur dome, and to which appellant refused to agree. The allegation that appellees by acquiring for themselves and permitting others to acquire royalty interests in the other subdivisions of the dome does not tend to show that appellant's right to produce sulphur from his land has been in the least impaired, in the absence of allegations that appellees have refused to enter into a community lease with appellant for the production of sulphur under these lands.

The following quotation from appellees' brief, I think, acurately and conclusively states the question presented by this appeal: "In fact, it plainly appears from the petition that the lessor sold the lease on his land for a very substantial consideration; that the lessee committed no wrong while it held the lease, and that the lease terminated by its own express provisions (and by its surrender by appellees). Upon the termination of the lease the lessor was in the same situation that he was in before he gave the lease. Obviously, he has no complaint and has stated no cause of action."

The motion for rehearing is refused.

Refused.