**TEXAS & PACIFIC COAL & OIL CO. v.
STUARD et ux. (No. 10636.)**

(Court of Civil Appeals of Texas. Fort Worth.
Nov. 1, 1924. Rehearing Denied Dec. 20,
1924. Writ of Error Dismissed for Want of
Jurisdiction Feb. 4, 1925.)

**1. Mines and minerals ⬤⇒78(1)—Lessee required only to exercise sound judgment in developing leased premises for oil.**

Lessee in development of leased premises for oil is required only to exercise sound judgment as to whether he will drill wells other than those specifically provided for in lease and to exercise good faith and sound discretion as to how deep he will drill wells sunk on land, where no specific depth is mentioned or implied in lease.

**2. Trial ⬤⇒350(4) — Submission of issue whether oil in paying quantities would have been struck held erroneous, where testimony showed that land was nonproductive.**

Submission of issue whether wells drilled on plaintiffs' land by lessee would have struck oil in paying quantities if they had been drilled deeper, or whether drilling of a third well would produce oil in paying quantities, *held* erroneous, where testimony showed that land was nonproductive.

**3. Mines and minerals ⬤⇒78(1)—Lessee's implied obligation is to drill in good faith to depth reasonably necessary to test land.**

Under contract to develop lands for oil, lessee's implied obligation is to exercise good faith and sound discretion in drilling to a depth that is reasonably necessary to test the land.

**4. Mines and minerals ⬤⇒78(7)—Finding that lessee in good faith concluded that it would be unprofitable to drill further for oil held warranted.**

In action for damages for lessee's failure to develop oil land, evidence *held* to support finding that lessee exercised good faith and discretion in concluding that it would not be profitable to drill deeper two wells sunk on premises or to sink another well thereon.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Action by R. C. Stuard and wife against the Texas & Pacific Coal & Oil Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

John Hancock, of Fort Worth, for appellant.

Burkett, Orr & McCarty, of Eastland, for appellees.

BUCK, J. By their amended petition, filed May 31, 1922, plaintiffs, R. C. Stuard and wife, C. U. Stuard, alleged: That on October 26, 1917, they executed and delivered to appellants an oil and gas lease on 56 acres of land, out of the Blundell survey in Eastland county, for a consideration of $456 in cash and that drilling preparations be begun on said premises within 60 days from the date of the lease. That in connection with and contemporaneous with the making of said lease, and as a further consideration for the signing of the same, W. K. Gordon, acting for appellant, verbally agreed to drill and complete an oil well upon said premises and to develop same after completion of said oil well with due diligence until said land proved to be unproductive of either oil or gas. That it was contemplated by both parties to said contract that any and all of said well or wells drilled on said premises should be completed in a workmanlike manner and should be kept in repair in proper and diligent manner so long as oil or gas, or either, should be produced in paying quantities. That appellants did begin drilling within 60 days, and the well, known as "Stuard No. 1," was drilled to the oil and gas-bearing stratum, and a "tremendous volume of gas was encountered, and considerable oil, the exact amount of which plaintiffs are unable to say, but proof of which will be offered on the trial hereof. That the drillers and contractor on said well had same in good shape and condition when the gas and oil was encountered, and would have completed said well in good shape and made same an excellent producer of oil and of gas, which would have been very beneficial to plaintiffs, they receiving 10 per cent. of the value of the gas and one-eighth of the oil produced from said premises, under the terms of the lease. That the agent and manager of the defendant caused a control head to be placed upon the six-inch casing, through which said well was producing oil and gas, and ordered same to be closed in. The drillers and contractor protested to this and told said manager and agent of the defendant that to do so with a tremendous gas pressure would in all likelihood cause the casing to be raised out of the well and ruin the same. That notwithstanding such protests, defendant's agent and manager closed and caused to be closed the control head on said casing, and the tremendous pressure of the gas immediately lifted said string of casing out of the hole and up through the top of the derrick some 100 feet or more, and the control head finally was blown off and the pressure relieved, and the casing fell and dropped back into the hole and collapsed and ruined the well for oil and gas purposes. That the proximate cause of such collapse and ruin of said well was the negligence and mismanagement of

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the defendant, its agents and employees. That in drilling down to the oil and gas strata salt water in large quantities was encountered and was necessary to be cased off, and which was cased off by the defendant; and that when said pipe was raised by the gas pressure as above described, salt water was permitted to come into said oil and gas well and was permitted to remain therein, and the defendant failed and refused to keep said well in repair, and same was ruined by the negligence and mismanagement of the defendant, its agents and employees."

Plaintiffs further pleaded that the defendant thereafter drilled another well on plaintiffs' premises and "struck much oil, and while setting, or attempting to set, the six-inch casing in said well, through the negligence and carelessness of the defendant, its agents and employees, said casing was dropped for a considerable distance, collapsing same, and jamming said well and ruining same for oil purposes; that had said second well been properly handled same would have produced oil in paying quantities to these plaintiffs' great benefit." They further alleged that the defendant was under obligation to develop said premises with diligence for oil and gas purposes, but that it failed and refused to drill any other or further well to plaintiffs' great damage. That defendant, though often requested by plaintiffs, refused and failed to drill and complete a well in a workmanlike manner, and thereafter to diligently develop said premises until fully proven. It was further alleged that the land of plaintiffs under lease was proven territory. Allegations of further damages, by reason of slush pits and other excavations alleged to have been left on said land, piles of old wire, casing, etc., and by reason of salt water being allowed to run over said land, were made.

The defendant answered by way of a general demurrer, a number of special exceptions, a plea of not guilty, and further alleged that it had within the proper time drilled two wells in a workmanlike manner and "produced considerable oil from well No. 1 and paid to plaintiffs all of the royalties due on said production; that oil in paying quantities was not discovered or produced from either of said wells; and that in the opinion of the defendant said land was, and is, unworthy of further development for oil and gas purposes; that all of the rentals provided for in said lease were timely paid by defendant to plaintiffs and accepted by them." Defendant further pleaded the two and four years' statutes of limitation.

A trial was had before a jury and certain special issues submitted, which were answered by the jury as follows:

(1) That the defendant, through its agent,

W. K. Gordon, agreed to drill and complete a well for oil and gas purposes on plaintiffs' premises at the time of entering into the written lease contract with the plaintiffs.

(2) That it was contemplated by both plaintiffs and defendants that any well or wells drilled upon plaintiffs' premises should be completed in a workmanlike and proper manner.

(3) That the defendant did not complete a well for oil or gas purposes as contemplated by the parties at the time of the execution of the lease.

(4) That the defendant did not complete a well on plaintiffs' premises in a proper and workmanlike manner as contemplated by their written contract.

(5) That the failure of defendant to complete a well upon plaintiffs' premises was due to negligence.

(6) That plaintiffs have been damaged by such failure of defendant to drill and complete in a workmanlike and proper manner a well upon plaintiffs' premises.

(7) That $30,000 would reasonably compensate the plaintiffs for the damages suffered.

(8) That if either of the wells drilled on plaintiffs' land had been drilled to a deeper sand by the defendant and completed in a proper and workmanlike manner same would have produced enough oil and gas to have amounted in value to the cost of drilling, equipping, and operating the same, and would have yielded in addition thereto a reasonable profit on the amount so expended.

(9) That if a third well had been drilled on the land leased by plaintiffs to defendant to the required depth, as contemplated under the contract between plaintiffs and defendant, such well would have produced enough oil and gas to have amounted in value to the cost of drilling, equipping and operating the same, and would have yielded in addition thereto a reasonable profit on the amount so expended.

(10) In answer to the question, "In your opinion, based upon the testimony before you, how many barrels of oil, if any, would have been produced from a third well drilled at the depth contemplated by the contract between the plaintiffs and the defendant had the same been drilled on the land leased?" the jury answered: "Unable in our knowledge to say how many barrels."

Judgment was rendered for the plaintiffs in the amount of $30,000, from which judgment the defendant has appealed.

The trial court filed findings of fact as follows:

"The court is of the opinion, and finds as a fact, that in the judgment of the defendant, Texas Pacific Coal & Oil Company, the land covered by the lease involved herein is now and was within 60 days from the date that the Stuard No. 2 on the lease in controversy was completed to a depth of 3,225 feet, and had been

shot and found to be a dry hole at the depth drilled, unworthy of further development for oil and gas purposes, which judgment on the part of the defendant herein in the opinion of the court was exercised in good faith."

The trial court did not submit to the jury any question involving damages to the land by reason of the condition in which the defendant left it, by the presence of the slush pits, oil, casing, etc.; hence the recovery awarded plaintiffs below must rest, if at all, upon the failure of defendant to drill a well or wells to the required depth, that is, perhaps to the McClesky sand, shown to be some 3,400 feet below the surface, and to so drill it in a workmanlike manner.

The oil and gas lease executed by plaintiffs to defendant was for seven years from the date thereof, to wit, October 26, 1917. The defendant agreed "to begin operations to drill a well on the land herein leased within 60 days from this date, and the failure to begin such operations will act as a forfeit on this lease contract." As before stated, a down payment of $456 was made as the rentals for the first year, and at the expiration of the first year defendant had a right to continue the lease contract upon the payment of $1 per acre per annum, less the amount of any royalties paid by the defendant to plaintiffs during the preceding year. If the royalties should equal or exceed the annual rental provided, the plaintiffs agreed to accept said royalties as full payment of the ground rent for the year. A former contract of lease was executed by Mr. R. C. Stuard, same being dated March 23, 1917; but Mrs. Stuard did not join in this lease, and suit was brought upon the lease which she, jointly with her husband, executed.

Taking into consideration the undisputed evidence in this case, and the findings of the jury, and the finding of the court that the defendant's judgment, that the second well was a dry hole and that it would be useless to drill deeper, was exercised in good faith, the judgment of the court below must stand, if at all, upon the implied obligations of the defendant to drill a third well to a depth equal to the McClesky sand. The McClesky well had been drilled to a depth of 3,400 feet, and was about one and a quarter miles from the Stuard well No. 1. It produced considerable oil, and then the production decreased until it ceased to be a producing well.

Mr. W. K. Gordon, who made the contract between the plaintiffs and the defendant, and acted for the defendant, testified: That it was his intention at the time of making the contract to go down to the McClesky sand. That he would have gone to that depth in the second well if the drilling operations in that vicinity had not shown that there was little prospect of finding oil in paying quantities on the Stuard land and on land adjacent thereto. That nothing was said as to how deep the well should go, but that he had in mind to go to the depth of the McClesky well, and would have done so if some other wells had not been drilled that deep and disclosed that oil was not in that sand in or near the Stuard lease.

The evidence shows beyond dispute that in the judgment of the oil drillers and prospectors in the Ranger territory, the Stuard tract and other tracts adjacent and near thereto were, at the time of the abandonment of the second well, thought to be nonproductive. The evidence shows further that as to Stuard well No. 1, when it reached the depth of 3,200 feet, and in an attempt to withdraw the casing, preparatory to drilling the well in, the casing parted about 160 feet below the surface, and further efforts to drill the well deeper were abandoned. The plaintiff R. C. Stuard testified:

"I had a conversation with Mr. Gordon after No. 1 well came in. I talked to him at different times. The conversations were about drilling another well. * * * As to what Mr. Gordon said to me, I went down in town, me and my son, and hunted up Mr. Gordon. We found that he was out at the Shook well, and I went out there to see him, and he was in eating dinner, and I waited there until he came out, and I says, 'Mr. Gordon, I have come over to see you about that well.' And I says, 'Mr. Clifton said for me to see if you was going to try to get that casing out,' said he was there on expense, and he says, 'Mr. Stuard,' folded his arms this way (indicating) and says, 'I tell you, I didn't—I will be glad to make this kind of a deal. I need the gas to develop my field and develop other wells,' and he says, 'I would like for you to let me use that gas and I will immediately drill you another well.' I studied a little bit and waited a little while, and I says: 'Now, Mr. Gordon, if you will do that, I will do it; I will let you have the gas.' Gordon was there in his car, and says, 'Now, get in the car and we will go right over there to the well,' and I says, 'Why not get Mr. Clifton to do that work?' and I says, 'I just as soon have Mr. Clifton to do it,' and he says, 'Well, he drilled the first one, and we will get him to drill the other one if you want him to.' And we drove over to the well, and Mr. Clifton was here, and Mr. Gordon says, 'How quick can you go to drilling Mr. Stuard another well?' and Mr. Clifton says, 'Any time,' and Mr. Gordon says, 'Make the location and go ahead,' and says, 'We will drill him another well, and we will have to use this well for gas—we don't know when we could get this casing out.' Mr. Clifton says, 'No, you make the location and I will move to it.' Mr. Clifton said that, and the next day I saw a stob down below No. 1 drove up and Mr. Clifton was moving to it, moving his things to it."

We think this conversation discloses that neither the plaintiff Stuard nor Mr. Gordon, acting for the defendant, considered that well No. 1, in the condition it was at that time, was a compliance with the agreement between the plaintiff and defendant, as shown by their contract, to drill a well.

Both parties seemed to recognize that the first well had not gone deep enough to prove the territory, and that in pursuance of the contractual obligation on the part of the defendant, another well was to be drilled. It is true that Gordon testified that well No. 1 was not injured by the parting of the casing, and that it produced gas in a considerable amount, and oil in a limited quantity for a year or more; that the casing did not collapse in dropping back into the well, and that they measured the depth of the well after the casing dropped back into it and it was as deep as it was shown to have been drilled in the first place.

Plaintiffs alleged in their amended petition that well No. 1 "was drilled to the oil and gas-bearing strata and a tremendous volume of gas was encountered and considerable oil"; but we think the evidence shows that both parties recognized that the drilling of well No. 1, under the circumstances shown, was not a fulfillment of the contract. Mr. Gordon, acting for defendant, asked plaintiff Stuard to let Stuard well No. 1 stay in its present condition; that he (Gordon) needed the gas produced from it for the development and operations not only of Stuard well No. 1, but of the territory adjacent thereto, and offered to drill another well in the place of it. Both parties agreed to this, as before shown.

The findings of the jury in answer to special issues 3, 4, 8, and 9, and the finding of the court as heretofore shown with reference to well No. 2, can be reconciled only on the theory that the defendant in the exercise of good faith decided that said well No. 2 was in a dry territory, but that it was mistaken in this assumption, and that by going to a deeper sand oil in paying quanities could have been found in both wells, and in a third well had it been drilled.

Thornton on Oil & Gas (3d Ed.) p. 220, § 139, says:

"It is the duty of the lessee to make diligent search and operation of the leased premises; and it is not necessary that a provision for such search or operation be inserted in the lease; for it is an implied covenant in every oil and gas lease that a diligent search and operation will be prosecuted."

See Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; Mid-Texas Petroleum Co. v. Colcord (Tex. Civ. App.) 235 S. W. 710.

[1] But in the performance of this duty to develop the leased premises, the lessee is required only to exercise sound judgment and discretion as to whether in the development of the leased premises he will drill wells other than those specifically provided for in the contract of lease, and to exercise good faith and sound discretion as to how deep he will drill the wells sunk on the land, where no specific depth is mentioned or implied in the lease.

Thornton on Oil & Gas (3d Ed.) p. 235, says:

"It is for the operator, acting in good faith, to determine when the lease is no longer profitable; and the lessor cannot terminate it because it is not profitable to him to have it continue."

In section 148, p. 232, of the same work, it is said:

"A very common expression in oil and gas leases is that they are to continue so long as oil and gas is or can be produced in 'paying quantities.' This is a clause for the benefit of the lessee; for it is obvious that a prudent man would not want to pay rent for premises after they had ceased to be productive; nor would he care to operate them, on even a royalty, where the operating expenses were more than the income."

See T. & P. C. & O. Co. v. Bruce (Tex. Civ. App.) 233 S. W. 535; Hawkins' Digest of Texas, Oil & Gas Decisions, p. 40, § 102, and cases there cited.

All the testimony upon the issue as to whether the Stuard tract and the land adjacent thereto was productive or nonproductive territory supports the conclusions that it was nonproductive. W. K. Gordon testified:

"I know where the Cooper well is near this land—there are two Cooper wells. One of the Cooper wells was up the railroad in this direction from the Stuard farm, which would be southwest (indicating), and the other one is practically, nearly south, I should say. Cooper No. 2 must be within a quarter of a mile of this land, this Stuard lease, and Cooper No. 1 is about three-quarters of a mile. Cooper No. 1 had a small showing of oil and Cooper No. 2 was absolutely dry. The records, I think, will show that—I don't think I am mistaken. I don't think I am mistaken when I state that Cooper No. 2 was drilled even deeper than the McClesky sand. We went deeper down than the McClesky sand and didn't get any production. The small showing of oil that we got from Cooper No. 1 was of no consequence—it was a very small showing."

He then goes on and considers a number of wells in this vicinity, which were drilled in about the time that the Stuard wells were being drilled, or subsequent thereto, none of which produced oil in sufficient quantities to make it profitable for the driller. He further testified:

"The other companies didn't believe there was oil there and they abandoned those leases. I had charge of everything. I could have drilled a thousand wells around there if I had thought there was oil under that land; I never would have stopped if I had thought there was any production under it."

It will be noted while Gordon was in the employment of the defendant, and its alter ego, yet he was introduced as a witness by the plaintiffs.

W. T. Garrett testified:

"My name is W. T. Garrett. I live in Eastland. I have lived in Eastland county about 20 or 22 years. I have had some experience in the oil business. As to what is the nature of the experience I have had, it has been drilling wells with others—not drilling wells, but having them drilled and operating them. I have an interest in—with others—in about 15 or 20 wells, something like that. I know where the R. C. Stuard tract of land is near the town of Ranger, just across the tracks there. I am familiar with the location of that property. I am familiar with the wells that have been drilled around that property, to the extent that I knew at the time they were drilling—just what I could see and found out going over the field. I found out if they were producers or what they were making. I own some royalty or mineral interest in lands in the vicinity of that R. C. Stuard land. I own some royalty in the Jack Phillips and in the Lindscott. * * * From the knowledge I have in the drilling of oil wells and the knowledge I have of the land in the vicinity of the R. C. Stuard land, in my opinion the R. C. Stuard land is not worthy of any further development for oil and gas purposes. It is not in my opinion. I would not drill a well on there—anywhere in that vicinity at all."

F. J. Bates testified, in part:

"Based upon my opinion and my knowledge of the production that was found in the wells in that vicinity and the dry holes that were drilled in that vicinity, in my opinion the R. C. Stuard lease is not worthy of any further development. In my opinion, there would not be enough oil or gas found on the R. C. Stuard lease if a well should be drilled there to pay for the cost of drilling the well. I base that opinion upon a study of the production of the wells in that vicinity."

I. H. Irving, Luther Davenport, and perhaps other drillers and operators testified to the same effect, and there is no testimony substantially contradicting the views expressed by these witnesses.

Appellants' twenty-eighth assignment is as follows:

"The court erred in submitting special issue No. 8 (the answer to which is hereinabove shown) to the jury, wherein inquiry is made as to whether or not enough oil and gas would have been produced from wells Nos. 1 and 2 to have amounted in value to the cost of drilling, equipping, and operating the same, and have yielded in addition thereto reasonable profit on the amount so expended had the same been drilled to a deeper sand by defendant and completed in a proper and workmanlike manner, because the undisputed evidence conclusively shows that so far as the oil fraternity knew there is no deeper sand which would produce oil and gas in paying quantities beneath said premises."

[2] Assignments are directed to the action of the court in overruling defendant's motion to set aside this answer and also to issue No. 9. We believe these assignments should be sustained, and that the judgment should be reversed and the cause remanded.

Appellant devotes a good deal of its brief in an attempt to show that the statutes of limitation, two and four years, bars plaintiffs' right of recovery. The only petition in the record is plaintiffs' first amended original petition, filed May 31, 1922. We have been unable to find any showing as to when the original petition was filed, and, therefore, are unable to determine whether this objection is good or not.

The testimony as to what the oral agreement was between either of the plaintiffs and W. K. Gordon, acting for the defendant, with reference to any special contract to develop the land for oil and gas, is very meager. The written contract provided:

"The T. & P. Coal Company agrees to begin operations to drill a well on the land herein leased within 60 days from the date, and failure to begin operations will act as a forfeit on this lease contract."

Mrs. C. U. Stuard, one of the plaintiffs, testified:

"I talked to Mr. Gordon with reference to this lease. He wanted to lease the land, and he promised me a drilling contract, and that he would go to drilling. He first said in 40 days, and then he said: 'No, I can't get ready in 40 days; but I will be drilling in 60 days.' He said he would pay me a dollar an acre. He said he would give us a dollar an acre and a drilling contract to drill for oil. Said he would develop the land."

T. T. Stuard, son of plaintiffs, testified that he was present when his mother signed said lease and heard the conversation with Mr. Gordon. He testified:

"Mr. Gordon told her he would give her $450 in money and go to drilling. He first says in 40 days, but he changed it and says, 'I can't get there by that time,' and says, 'But I will go to drilling in 60 days,' and she told him, 'All right.'"

Mr. Gordon testified:

"When we took this second lease from Mr. and Mrs. Stuard, my company signed a drilling contract to begin in 60 days. We intended to complete a well on that tract of land. I had based my decision to drill there upon the strength of the McClesky well being a good well. I did not know the extent of the well there at that time. I contracted to drill and complete the well upon that tract of land. At that time the McClesky well had gone, had been drilled, to a total depth of 3,400 feet and over. We considered that a deep test for that well at that time. That is what we had in mind when I took that contract from Mr. and Mrs. Stuard. That is what I intended to do down there if we didn't get production at a lesser depth. * * * As to whether or not I made that contract with the Stuards upon that basis, there was no specific depth. We intended going deep enough to test that piece of land."

[3, 4] The implied obligation on the part of a lessee, under a contract like the one under consideration, is to exercise good faith and

sound discretion to drill to a depth that is reasonably necessary to test the land. The lessee is not required to peer down into the soil with an X-ray vision and determine whether at any depth there can be found oil or gas, but merely to exercise good faith and sound discretion as to whether oil or gas may be found. We think the evidence fully supports the trial court's finding to the effect that the lessee in this case exercised good faith and discretion in its conclusion that it would not be profitable to it to drill deeper the two wells sunk on the Stuard lease, or to sink another well on it, and that such is all that a lessee is required to do. Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N. E. 502; Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; J. M. Guffey Pet. Co. v. Chaison Townsite Co., 48 Tex. Civ. App. 555, 107 S. W. 612.

We find nothing in the testimony to show that the defendant did not in the exercise of sound discretion and good faith fail or refuse to drill other wells on the land, or to drill either of the two wells sunk on the land to a greater depth.

For the reasons given, the judgment of the lower court is reversed, and the cause remanded.